IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KMK GROUP, LLC, NINE CROWN, LLC, CHICAGO 6034 W NORTH AVE, LLC, RADCLIFF 333 W DIXIE BLVD., LLC, and FLINT LAND COMPANY, LLC, | : : : : | |
| Plaintiffs, | : | No.: 1:15-cv-08140 |
| v. | : | Judge Joan B. Gottschall – Rm. 2325 |
| JASON LEVECKE; CARL LEVECKE; JC123, HOLDINGS, LLC; LEVECKE & COMPANY, LLC; ANDREA LEVECKE; AND NEISHA LEVECKE, | : : : : | Magistrate Young B. Kim |
| Defendants | : | |

**AMENDED COMPLAINT**

Plaintiffs KMK GROUP, LLC, NINE CROWN, LLC, CHICAGO 6034 W NORTH AVE, LLC, RADCLIFF 333 W DIXIE BLVD., LLC, and FLINT LAND COMPANY, LLC, by their attorneys, for their Amended Complaint against Defendants Jason LeVecke, Carl LeVecke, JC123 Holdings, LLC; LeVecke & Company, LLC; Andrea LeVecke; and Neisha LeVecke, state as follows:

**Jurisdiction**

1.  Plaintiff KMK Group, LLC ("KMK") is a limited liability company organized under the laws of California and has its principal place of business in Vernon, California. The sole member of KMK is a citizen of California.

2.  Plaintiff Nine Crown, LLC ("Nine Crown") is a limited liability company organized under the laws of California and has its principal place of business in La Mirada, California. All the members of Nine Crown are citizens of California.

1

3. Plaintiff Chicago 6034 W North Ave., LLC ("North Avenue") is a limited liability company organized under the laws of Utah and has its principal place of business in St. George, Utah. All the members of North Avenue are citizens of Utah.

4. Plaintiff Radcliff, 333 W Dixie Blvd., LLC ("Radcliff"), is a limited liability company organized under the laws of Utah and has its principal place of business in St. George, Utah. All the members of Radcliff are citizens of Utah.

5. Plaintiff Flint Land Company, LLC ("Flint Land") is a limited liability company organized under the laws of Illinois and has its principal place of business in Glen Carbon, Illinois. Flint Land is the surviving company of a merger of Chicago 124 E 103rd St. FLC, LLC (an Illinois limited liability company) and Flint Land. The sole member of Flint Land is a citizen of Illinois.

6. Defendant Jason LeVecke ("Jason") is a citizen of Arizona.

7. Defendant Andrea LeVecke ("Andrea") is a citizen of Arizona. Andrea is married to Jason.

8. Defendant Carl LeVecke ("Carl") is a citizen of Arizona.

9. Defendant Neisha LeVecke ("Neisha") is a citizen of Arizona. Neisha is married to Carl.

10. Defendant JC123 Holdings, LLC ("JC123") is a limited liability company organized under the laws of Texas and has its principal place of business in Guadalupe, Arizona. The members of JC123 are citizens of Arizona.

11. Defendant LeVecke & Company, LLC ("LeVecke") is a limited liability company organized under the laws of Arizona and has its principal place of business in Guadalupe, Arizona. The members of LeVecke are citizens of Arizona. LeVecke is the principal member of

JC123, and Jason and Carl are the principal members of LeVecke. Andrea and Neisha are co-owners, with their husbands, of the membership interests in LeVecke.

12. The amount in controversy exceeds $75,000.00 exclusive of interest and costs. This court has jurisdiction pursuant to 28 U.S.C. 1332(a)(1) and 28 U.S.C. 1331.

## Venue

13. Venue lies in this District pursuant to 28 U.S.C. 1391(b)(2) because real property that is the subject of this action is situated in this District in McHenry, Illinois (McHenry County), in Mokena, Illinois (Will County), and in Chicago, Illinois (Cook County).

## Count I (Conspiracy to Defraud)

14. Plaintiffs reallege paragraphs 1 through 13 as paragraph 14.

15. Jason is the Managing Member of JC123 and LeVecke. He is also the Managing Member of Frontier Star, LLC ("Frontier Star"). Frontier Star is a franchisee of CKE Restaurants and is franchisee of numerous Carl's, Jr. and Hardee's restaurants in seven states, including Illinois.

16. Beginning no later than early 2014, the Defendants created a scheme to defraud investors in commercial real estate comprising the following components:

   a) The Defendants would offer for sale a property that they did not own that was vacant or on which a franchise restaurant was operating and as part of the offer would represent that at the time of the sale Frontier Star would enter into an attractive long-term lease, personally guaranteed by Jason and sometimes also by Carl, and that they would operate a Hardee's restaurant at the location.

   b) Once an investor agreed to purchase the property, JC123 would purchase the property and promptly re-sell the property to the investor at a substantially

higher price because the investor's purchase was premised on a lease agreement being executed by Frontier Star at the time of the sale under which the rental stream in the lease justified the higher purchase price. Defendants would represent that the profit from the real estate transactions would fund the cost of converting the property to a Hardee's restaurant.

c) To induce the investor to purchase the property at the higher price based on a lease with Frontier Star, Defendants would provide the investor with financial information regarding Frontier Star showing that it had substantial operating profits and net worth; that operating profits were increasing annually; and that Frontier Star had net worth that increased annually. Defendants also would provide the investor with information about extensive experience that Jason and Carl, who are grandsons of Carl Karcher, the founder of Carl's Jr., had in the restaurant business and specifically in the management of CKE franchise restaurants, and of their strong relationship with the franchisor.

d) Defendants would not disclose that Frontier Star was actually in financial difficulty, had to restructure its financial relationship with CKE, was in default of its obligation to CKE, and periodically was unable to meet payroll or perform needed maintenance of its restaurants.

e) Contrary to their representations, Defendants would not use the profits from the real estate transactions to fund the conversion of the properties to Hardee's restaurants.

f) Once the Defendants concluded a number of these transactions, Jason and Carl would cause Frontier Star to disavow the leases either on the ground that

            Frontier had not obtained a Commitment Agreement from CKE to open Hardee's restaurants at those locations or through bankruptcy procedures.

    g) Even though the properties sold to the investors were in states other than Arizona, Jason's and Carl's personal guarantees specified that the guarantees were governed by Arizona law so that any judgment on the guarantees would be unenforceable under Arizona law because their wives would not co-sign the guarantees.

### The McHenry Property

17. One of the investors upon whom the defendants' scheme was used was KMK. KMK received information in March 2015 regarding a property offered for sale in McHenry, Illinois, in the form of a flyer published by defendants' real estate broker Parviz Donboli. A copy of the flyer is attached as Exhibit A. The flyer stated that the property currently had an Arby's restaurant that would be converted to a Hardee's. The offer price was $2,000,000 and the flyer stated that based on that price and the lease that would be entered into at the time of the sale with an initial annual rent of $140,000 the "cap rate" would be 7%. The "cap rate" (i.e., the capitalization rate) is calculated by dividing the annual rent by the purchase price and represents a percentage annual return on capital. Subsequent negotiations led to a reduction of the purchase price to $1,568,000, with an initial annual rent of $117,600, for a cap rate of 7.5%. The cap rate was a very attractive rate of return in the spring of 2015. KMK would not have purchased the property without a long-term lease with an attractive cap rate with a financially sound tenant and personal guarantees of the lease.

18. The information provided to KMK regarding the financial condition of Frontier Star and the relationship of Frontier Star, Jason and Carl with the franchisor was false and

5

misleading. The information did not disclose that the assets of Frontier Star had been transferred to another entity, MIH Admin Services, LLC, in 2011, and that this transfer violated the franchise agreements; that in 2010 Frontier Star was in default of its loan agreements and franchise agreements, requiring a restructuring arrangement; and that, notwithstanding the restructuring arrangement, Frontier Star since no later than 2013 was in default of its obligations under the franchise agreements and thus subject to termination of already-existing franchises.

19. On March 18, 2015, KMK, as buyer, and JC123, as seller, agreed to the purchase of the McHenry property by KMK, subject to the execution of a lease between KMK and seller, or an affiliate of seller, on terms set forth in the agreement, and subject to guarantees of the lease by Jason and Carl.

20. On April 13, 2015, JC123 purchased the McHenry property from its owner for $1,100,000.

21. On April 20, 2015, JC123 re-sold the McHenry property to KMK for $1,568,000. On the same date KMK and Frontier Star executed a 20-year lease with an initial annual rent of $117,600 based on $9,800 per month and Jason LeVecke and Carl LeVecke delivered personal guarantees. A copy of the lease is attached as Exhibit B. Copies of the guarantees are attached as Exhibits C [Jason] and D [Carl].

22. The McHenry property was encumbered by a lease with the owner of the Arby's restaurant. As part of the transaction, defendants had KMK agree that Frontier Star would have the rights of landlord as to the Arby's restaurant while Frontier was tenant as to KMK. The McHenry property was not converted to a Hardee's restaurant.

23. Frontier Star paid the monthly rent as provided by the lease to KMK for the months of May and June, 2015. Frontier Star accepted the rent payments from the Arby's for the

months of May, June, July and August 2015. On September 10, 2015, Jason advised KMK that the Arby's owner had been advised that KMK was its landlord and to send rent payments to KMK, and Margaret LeVecke informed KMK that rent payments received by Frontier Star from the Arby's owner would be forwarded to KMK. In taking these actions, defendants were asserting that no lease between KMK and Frontier Star had become effective. KMK will hold any rent payments it receives regarding the Arby's in a segregated account pending a determination of the remedy to which KMK is entitled.

### The Mokena Property

24. Another investor on whom the defendants' scheme was used was Nine Crown. Nine Crown received information in March 2015 regarding a property offered for sale in Mokena, Illinois, in the form of a flyer published by defendants' real estate broker Parviz Donboli. A copy of the flyer is attached as exhibit E. The flyer stated that the property currently had an A&W/KFC restaurant that would be converted to a Hardee's restaurant. The offer price was $1,700,000 and the flyer stated that based on that price and the lease that would be entered into at the time of the sale with an initial annual rent of $117,000 the "cap rate" would be 7%. [The advertised cap rate more precisely calculated was 6.9%.] Subsequent negotiations led to an increase of the initial annual rent to $119,000, for a cap rate of 7.0%. The cap rate was a very attractive rate of return in the spring of 2015. Nine Crown would not have purchased the property without a long-term lease with an attractive cap rate with financially sound tenant and personal guarantees of the lease.

25. The information provided to Nine Crown regarding the financial condition of Frontier Star and the relationship of Frontier Star, Jason and Carl with the franchisor was false and misleading. The information did not disclose that the assets of Frontier Star had been

7

transferred to another entity, MIH Admin Services, LLC, in 2011, and that this transfer violated the franchise agreements; that in 2010 Frontier Star was in default of its loan agreements and franchise agreements, requiring a restructuring arrangement; and that, notwithstanding the restructuring arrangement, Frontier Star since no later than 2013 was in default of its obligations under the franchise agreements and thus subject to termination of already-existing franchises.

26. On April 2, 2015, Nine Crown as buyer, and JC123, as seller, agreed to the purchase of the Mokena property by Nine Crown, subject to the execution of a lease between Nine Crown and seller, or an affiliate of seller, on terms set forth in the agreement, and subject to guarantees of the lease by Jason and Carl. The form of the agreement was identical to the form of the agreement for the sale of the McHenry property to KMK.

27. On April 20, 2015, JC123 purchased the Mokena property for $1,350,000 and immediately sold it to Nine Crown for $1,700,000. On the same date, Nine Crown and Frontier Star executed a 20-year lease and Jason and Carl delivered personal guarantees. The form of the lease and the guarantees was the same as for the McHenry property. At the time of sale the A&W/KFC restaurant was no longer operating.

28. Frontier Star paid the monthly rent as provided in the Mokena lease for the months of May and June 2015.

29. On June 30, 2015, the real estate broker for KMK and Nine Crown inquired about the conversion schedule to Hardee's restaurants for the Mokena and McHenry properties, as well as properties in Calvert City, Kentucky and Henderson, Tennessee that his clients had recently purchased from Defendants. Jason replied that they were opening 20 restaurants per year and would have updates about these four restaurants in about thirty days. The Mokena property was never converted to a Hardee's restaurant.

### The 6034 W. North Ave., Chicago Property and the 333 Dixie Blvd,, Radcliff, KY Property

30. Another investor on whom defendants' scheme was used was Jaith Brooking who is the managing member of Chicago 6034 W North Ave., LLC and Radcliff 333 S. Dixie Boulevard, LLC. In February 2014 and April 2014, respectively, Defendants' agent Matt Langfield offered, on behalf of Defendants, to sell properties located at 5034 W. North Avenue in Chicago and at 333 S. Dixie Boulevard in Radcliff, Kentucky, to Brooking. The North Ave. property was being operated as a KFC; the Radcliff property had been operated as a Long John Silvers/A&W. Langfield represented that the properties would be converted to Hardee's restaurants. Defendants provided Brooking with financial statements for Frontier Star for the years 2012 and 2013 showing profitable (and increasingly profitable) operations and net worth.

31. The information provided to Brooking regarding the financial condition of Frontier Star and the relationship of Frontier Star, Jason and Carl with the franchisor was false and misleading. The information did not disclose that the assets of Frontier Star had been transferred to another entity, MIH Admin Services, LLC, in 2011, and that this transfer violated the franchise agreements; that in 2010 Frontier Star was in default of its loan agreements and franchise agreements, requiring a restructuring arrangement; and that, notwithstanding the restructuring arrangement, Frontier Star since no later than 2013 was in default of its obligations under the franchise agreements and thus subject to termination of already-existing franchises.

32. On March 17, 2014, JC123 purchased the North Ave. property for $840,000 and the same day sold it to Chicago 6034 W North Ave., LLC for $1,700,000. On May 14, 2014, JC123 purchased the Radcliff property for $725,000 and sold it the same day to Radcliff 333 S. Dixie Boulevard, LLC for $1,700,000. Based on the rents to be paid under the leases, the cap rate

9

on each property was 9.6%. Langfield represented that the differences between the prices paid by JC123 and the prices paid by Brooking's LLCs would be used for conversion expenses. On the same date as each property was sold, Frontier Star executed a 20-year lease and Jason provided a personal guarantee of each lease. The lease and personal guarantee were in the same form as for the McHenry lease and guarantee, except that pursuant to the requirement of Brooking's bank, the Commitment Agreement contingency clause was deleted just prior to the closing of the North Avenue sale. The properties were never converted to Hardee's restaurants. Rent was paid on the leases until June, 2015.

## The 124 E. 103rd Street, Chicago Property

33. Another investor on whom the Defendants' scheme was used was Ethan Flint, Jaith Brooking's cousin. Brooking introduced Flint to Langfield who offered in April or May 2014, on behalf of Defendants, to sell a property located at 124 E. 103rd Street, Chicago, to Flint. The property was being operated as a KFC restaurant. Flint was also provided with the Frontier Star financials for 2012 and 2013. On May 8, 2014, JC123 purchased the property for $700,000 and on May 9, 2014 sold it to Chicago 124 E. 103 St, LLC for $1,900,000. In addition, Flint paid Defendants $400,000 for renovation expenses. Defendants, through Langfield, represented that the difference between the purchase price paid by JC123 and the price paid to JC123, together with the $400,000 payment, would be used to convert the property to a Hardee's restaurant. Contemporaneously with the sale of the property, Frontier Star executed a 20-year lease for the property, and Jason provided a guarantee of the lease. The lease and the guarantee were in the same form as for the McHenry lease. The property was never converted to a Hardee's restaurant.

34. The information provided to Flint regarding the financial condition of Frontier Star and the relationship of Frontier Star, Jason and Carl with the franchisor was false and misleading. The information did not disclose that the assets of Frontier Star had been transferred to another entity, MIH Admin Services, LLC, in 2011, and that this transfer violated the franchise agreements; that in 2010 Frontier Star was in default of its loan agreements and franchise agreements, requiring a restructuring arrangement; and that, notwithstanding the restructuring arrangement, Frontier Star since no later than 2013 was in default of its obligations under the franchise agreements and thus subject to termination of already-existing franchises.

### **Defendants' Repudiation of the Leases and Guarantees**

35. On July 27, 2015, Frontier Star filed a petition in the United States Bankruptcy Court for the District of Arizona for reorganization under Chapter 11 of the Bankruptcy Code.

36. On August 1, 2015, Frontier Star notified Nine Crown and KMK that it would cease making payments under the Mokena and McHenry leases because it had not obtained a Commitment Agreement from CKE and asserted that the leases were therefore ineffective. Frontier Star continued to accept rent payments from the Arby's for the McHenry property.

37. Subsequent to filing its bankruptcy petition, Frontier Star filed motions to cancel the leases for the North Avenue property, the 103rd Street property and the Radcliff property.

38. At the time Defendants sold the McHenry and Mokena properties to KMK and Nine Crown, respectively, Defendants knew that the buyers were buying the properties on the strength of the leases providing cap rates of 7.0 to 7.5% and guarantees that were to be provided contemporaneously with the transaction. Defendants knew that KMK and Nine Crown would not have purchased the properties without the leases and guarantees. Defendants also knew that the Defendants would not convert the properties to Hardee's restaurants and that they would

11

disavow obligations under the leases and the guarantees, leaving the buyers with over-priced properties while Defendants made hundreds of thousands of dollars profit from flipping the properties.

39. At the time Defendants sold the North Avenue, 103rd Street and Radcliff properties to Brooking's and Flint's LLCs, Defendants knew that the buyers were buying the properties on the strength of the leases providing cap rates of 9.6% and guarantees that were to be provided contemporaneously with the transaction. Defendants knew that Brooking and Flint would not have purchased the properties without the leases and guarantees. Defendants also knew that the Defendants would not convert the properties to Hardee's restaurants and that they would disavow obligations under the leases and the guarantees, leaving the buyers with over-priced properties while Defendants made hundreds of thousands of dollars profit from flipping the properties.

40. The foregoing scheme was agreed upon by Jason and Carl, individually, and by Jason, as Managing Member, on behalf of JC123, LeVecke, and their respective spouses, and all of the defendants acted in concert to affect the scheme, constituting a conspiracy to defraud the buyers of properties.

Wherefore, Plaintiffs pray for the following relief:

    a. That the sales of the McHenry, Mokena, North Avenue, 103rd Street and Radcliff properties be rescinded and that JC123 and any Defendants to whom the proceeds of the sales have been disbursed be ordered to refund the purchase price of those properties to the purchasers. In the event of rescission, the amount of any rent payments received by any of the Plaintiffs from tenants other than Frontier Star will be applied to the purchase price refund.

      b.      That, as an alternative remedy to rescission, that damages be awarded to KMK in an amount no less than $468,000, to Nine Crown in an amount no less than $350,000, to North Avenue in an amount no less than $860,000, to Radcliff in an amount no less than $975,000, and to Flint Land in an amount no less than $1,600,000, and that Plaintiffs be awarded punitive damages in an amount determined by the Court.

### Count II (Illinois Consumer Fraud and Deceptive Practices Act)

41.    Plaintiffs reallege paragraphs 1 through 40 as paragraph 41.

42.    A further effect of Defendants' scheme is that by deceptively causing Plaintiffs to overpay for the McHenry, Mokena, North Avenue and 103rd Street properties it becomes less likely that the properties will be re-developed for productive use for the benefit of consumers.

43.    Defendants' scheme constitutes a deceptive practice within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive Practices Act.

Wherefore, Plaintiffs pray that, pursuant to Section 10 of the Illinois Consumer Fraud and Deceptive Practices Act, they be awarded their damages and their attorneys' fees.

### Count III (Personal Guarantees)

44.    Plaintiffs reallege paragraphs 1 through 40 as paragraph 44.

45.    The McHenry and Mokena properties were sold to KMK and Nine Crown respectively under the express representation that Jason and Carl would personally guarantee the leases. The North Avenue, Radcliff and 103rd Street properties were sold to North Avenue, Radcliff and Flint Land under the express representation that Jason would personally guarantee the leases.

46. Jason and Carl are directly or indirectly members of the seller of the properties, JC123, and therefore benefitted from the sales of the properties to Plaintiffs. Jason's and Carl's guarantees were therefore coupled with an interest.

47. Jason and Carl were aware that Frontier Star did not pay rent for the McHenry and Mokena properties for July, August and September 2015, and that Frontier Star had asserted that the leases were not enforceable against it because it had not obtained a Commitment Agreement from CKE. Jason was also aware that Frontier Star did not pay rent for the North Avenue, 103rd Street, and Radcliff properties for July, August and September 2015.

48. The personal guarantees of Jason and Carl provide that they are responsible for obligations under the leases they guaranteed even if the leases are unenforceable against Frontier Star.

49. Jason and Carl have failed to pay the rent amounts provided in the leases that they respectively guaranteed that were due beginning with the rents for July 2015 and each month thereafter.

50. The guarantees expressly waive any requirement of demand or presentment as prerequisite to enforcement.

Wherefore, if the Plaintiffs' purchases are not rescinded, Plaintiffs pray that the Court order that Jason LeVecke and Carl LeVecke pay to the Plaintiffs all of the rents provided in the leases that they guaranteed and that they fulfill all Tenant responsibilities under the leases, without regard to whether a Hardee's restaurant is operated on the properties. Plaintiffs further pray that, pursuant to the terms of the guarantees, Plaintiffs be awarded their attorneys' fees.

### Count IV (18 U.S.C. 1962 (c) and (d))

51. Plaintiffs reallege paragraphs 1 through 40 as paragraph 51.

52. 18 U.S.C. 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

53. 18 U.S.C. 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

54. The scheme described in paragraphs 1 through 40 constitutes a violation of Sections 1962(c) and (d):

> a. The scheme involves two enterprises that are engaged in or affect interstate commerce: Frontier Star, which is the licensee of numerous Hardee's restaurants that are engaged in interstate commerce through their purchase of goods, and the informal association of the Defendants as an association in fact, created to sell properties to investors based on false and misleading representations.
>
> b. The scheme involves racketeering activity comprised of mail fraud and wire fraud, in that the Defendants and their agents sent the false and misleading documents containing information regarding Frontier Star and the LeVeckes, the executed leases, and the personal guarantees to Plaintiffs through the United States Mail and through e-mails, and otherwise communicated directly and through their agents, with the Plaintiffs by e-mail to affect the transactions.

15

    c. The scheme involved not only the transactions involving the McHenry, Mokena, North Avenue, 103rd Street, and Radcliff properties, but at least thirty other properties.

    d. The scheme involved a pattern of racketeering activity in that it extended for more than a year. For example, on February 26, 2014, Defendants' agent Matt Langfield sent an e-mail to Jaith Brooking regarding the property at 6034 W. North Avenue, Chicago, IL, stating: "We have a property in Chicago that is $1,700,000 @ 9CAP. The rent would be $153,000/year….This is currently a KFC that we are going to convert to a Hardee's." Following a response from Brooking, the same day Langfield sent a second e-mail to Brooking, stating "Jason agreed with a 9.6CAP, we do however need to close as quickly as possible. 30 days is the outside to us. I will get PSA, lease and PG from Jason for you to review." The scheme extended into October 2015 through motions filed by Frontier Star in the bankruptcy court to reject leases entered into by Frontier Star for properties that are the subject of the scheme, i.e., properties flipped by Defendants with sales prices based on the Frontier Star lease but which properties were never converted to Hardee's restaurants.

    e. The scheme also involved a conspiracy among all of the Defendants to engage in racketeering activity as alleged herein.

Wherefore, Plaintiffs pray for the following relief pursuant to 18 U.S.C. 1964:

    a. That Defendants be ordered to rescind the sales of the properties to Plaintiffs and refund the purchase price, together with interest, costs and attorneys' fees.

16

      b. In the alternative, that judgment be entered in favor of Plaintiffs against all Defendants, jointly and severally, in an amount no less than the difference between the price Plaintiffs paid for each property and the fair market value of the property without the lease and personal guarantee and that said amount be trebled as provided by applicable law.

Dated: October 13, 2015

                                    By:   s/ Alan I. Becker
                                           Attorney for Plaintiffs

Alan I. Becker
LITCHFIELD CAVO LLP
303 West Madison Street, Suite 300
Chicago, IL 60606-3300
Phone: (312) 781-6677 (Main)
Phone: (312) 781-6622 (Direct)
Fax:    (312) 781-6630
A.R.D.C.#: 00147524
becker@litchfieldcavo.com